UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
CESAR MARTINEZ,

                    Petitioner,

                                                    04 Cv. 8617 (RPP)

                    - against -                     **OPINION & ORDER**

WILLIAM PHILLIPS, Superintendent of
Green Haven Correctional Facility,

                    Respondent.
-------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

        *Pro Se* Petitioner Cesar Martinez ("Petitioner"), an inmate at Greenhaven

Correctional Facility, brings this petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, challenging his October 29, 1998 conviction after trial, in New York State

Supreme Court, Bronx County, of two counts of Murder in the Second Degree (N.Y.

Penal Law §§ 125.25 (1) and (3)), one count of Robbery in the First Degree (N.Y. Penal

Law § 160.15(2)), one count of Robbery in the Second Degree (N.Y. Penal Law § 160.10

(1)), and one count of Kidnapping in the Second Degree (N.Y. Penal Law § 160.1(1)).

Petitioner's conviction stemmed from the kidnapping and killing of Damian Blanding,

who had stolen drug proceeds due Petitioner.  On November 30, 1998, Petitioner was

sentenced to a prison term of from twenty-five years to life, that was to run consecutively

to a prison term of from eight and one-third years to life that Petitioner had already been

serving for attempted murder.

        Petitioner argues that: 1) his conviction was against the weight of the evidence

presented at trial; 2) there was legally insufficient evidence to convict him; 3) his federal

due process rights were violated by the prosecutor's deliberate decision to elicit false

testimony and her failure to correct testimony that she knew to be false; 4) the prosecutor did not turn over all Brady/Rosario material prior to trial, and; 5) he was denied the effective assistance of counsel.[1]

For the reasons stated below, the petition is denied.

## 1. The Facts

A. The Indictment

By Bronx County indictment number 603/1996, a grand jury charged Petitioner, Theodore Simpson, and Hector Chebere (Petitioner's half-brother), while acting in concert with each other and others, with two counts each of Murder in the Second Degree, Robbery in the First Degree, and Criminal Use of a Firearm in the First Degree, and one count each of Manslaughter in the First Degree, Robbery in the Second Degree, Kidnapping in the Second Degree, Criminal Possession of a Weapon in the Second Degree, Criminal Possession of a Weapon in the Third Degree, Conspiracy in the Second Degree, Criminal Solicitation in the Second Degree, Criminal Facilitation in the Second Degree, Hindering Prosecution in the First Degree, and Unlawful Imprisonment in the First Degree.  From October 6-29, 1998, a joint trial consisting of Simpson, Chebere, and Petitioner was held before the Honorable Daniel FitzGerald and a jury.[2]

---

[1] Petitioner filed his initial petition for a writ of habeas corpus on July 14, 2004 ("Habeas Petition"), and Respondent replied on August 1, 2005.  ("First Response.").  Petitioner amended his petition on April 28, 2006 ("Amended Petition"), and Respondent replied on September 18, 2006.  ("Second Response.") Petitioner amended his petition for a second time on October 15, 2007 ("Second Amended Petition"), to which Respondent replied on February 21, 2008.  ("Third Response.")

[2] Co-defendants Theodore Simpson and Hector Chebere were tried with, and convicted of the same charges as Petitioner.  Simpson received the same sentence as Petitioner and his conviction was affirmed by the Appellate Division, First Department.  See People v. Simpson, 284 A.D.2d 238 (N.Y. App. Div. 1st Dept. 2001).  His application for leave to appeal to the New York Court of Appeals was denied, see People v. Simpson, 96 N.Y.2d 942 (2001), as was his petition for a writ of habeas corpus to this Court.  See Simpson v. Greene, 2003 U.S. Dist. LEXIS 23022 (S.D.N.Y. 2003).  Chebere received a sentence of from 22 years to life on the second-degree murder charges.  His conviction has been affirmed, and leave to the New York Court of Appeals has been denied.  See People v. Chebere, 292 A.D.2d 323 (N.Y. App. Div. 1st Dept.

B.  <u>The Evidence at Trial</u>

i. *The People's Case*

In 1993, when he was staying with his mother, witness Jose Caban lived at 975 East 181st Street in The Bronx, and he lived at 900 Bronx Park South when he was staying with his girlfriend. (Caban Tr. 700, 894.)[2]  Caban had known Petitioner and his half-brother Hector Chebere, as well as Theodore Simpson, for eighteen years.   (Caban Tr. 712-18.)  He also knew that all three lived at 900 Bronx Park South.  (Caban Tr. 712-18).  In April 1993, Caban received a page on his beeper from a friend Darryl; Darryl told him to come to his house so that he could give Caban drugs.  (Caban Tr. 723-25, 932, 1007, 1016, 1022.)  Caban, along with his friend Rafael Ortiz, drove to Darryl's home. (Caban Tr. 719-21, 725.)  There, Darryl gave Caban heroin and told him to sell the drugs; Caban would then give Darryl back $15,000 and keep the remainder of the proceeds for himself.  (Caban Tr. 725-29, 1089-90.)  Caban and Ortiz then went to 181st Street and Bryant Avenue to speak to Lenny, co-defendant Chebere's brother-in-law, about having Chebere "cut" the heroin for them (Caban Tr. 730-33.)  Lenny took Caban to Chebere, who said he would "cut" the heroin; Caban and Cherebe then made a deal to split the proceeds from the heroin sales.  (Caban Tr. 731-34.)

---

2001), <u>lv. denied</u>, 98 N.Y.2d 673 (2001).  His petition for a writ of habeas corpus is currently pending in this Court before Judge Preska.  <u>See</u> <u>Chebere v. Phillips</u>, 04-cv-296.

[2] Caban, who was twenty-four years old at the time of trial, had a long criminal history.  He began selling drugs at age fourteen (Caban Tr. 934, 953), he had participated in numerous bank robberies both in New York and Ohio  (Caban Tr. 701-711, 703, 721), and he had repeatedly lied to federal authorities about his involvement in the robberies.  (Caban Tr. 701-11, 950-56, 1030). On September 27, 1994, Caban pled guilty to armed bank robbery, and on December 12, 1994, he was sentenced to six and one-half years incarceration.  (<u>Id.</u>)  In exchange for cooperating on two bank robbery cases and two New York homicide cases, his federal sentence was the reduced to six-and-a-half-years, and a supermarket robbery case was dismissed (Caban: Tr. 900-03, 949).  Additionally, in exchange for testifying truthfully at the instant homicide trial, he would not be charged in the case.  (Caban Tr. 903, 949, 954, 989.)

Then, with Chebere driving a black van that he borrowed from Anthony Roman, Chebere and Caban purchased the materials Chebere needed to cut the heroin, and they drove to Chebere's girlfriend Rosegalia's apartment at 2134 Vyse Avenue, where Chebere "cut" the heroin.  (Caban Tr. 734-39, 743-44; Roman Tr. 1254-57.)  After cutting the heroin, Caban and Chebere tried to sell the drugs for two or three days in two separate locations, and then they continued to try to sell it for an additional three weeks; however, there were few buyers of the heron.  (Caban Tr. 744-46.)  At that point, Chebere told Caban that a person who lived at 800 East 180th Street in the Bronx was going to travel to Columbus, Ohio, and sell the heroin there.  (Caban Tr. 744-46, 748-51, 758-64, 1123.)  They did not speak again for six weeks (Caban Tr. 766).

Meanwhile, witness James Venson and Simpson had been trying to sell Chebere and Caban's heroin for two or three days at 900 Bronx Park South and at 181st Street and Daly Avenue. (Venson Tr. 572, 578, 581, 585-87, 598-600, 603, 676, 694.)[5]  Simpson, Venson, Petitioner and Chebere spoke about the drug sales, and Simpson said that the heroin was not selling well; Petitioner said that they should sell the heroin in Ohio, and Simpson and Chebere agreed.  (Venson Tr. 601-02.)  About a week or two later, Venson, Petitioner, Simpson and Chebere had a conversation in Simpson's apartment.  (Venson Tr. 604-05, 681.)  Petitioner asked who they were going to send to Ohio to sell the heroin, and Venson said that he and Simpson would go.  (Venson Tr. 605.)  Simpson said that they needed Venson to manage the "drug spot" at 900 Bronx Park South, and

---

[5]Venson had been convicted of two felonies and eight misdemeanors.  (Venson  Tr. 555-59, 561-67.) Venson stated that he had nothing "against" defendant or the co-defendants; he was testifying because since being in drug rehabilitation programs, he had learned to change his attitude and behavior (Venson Tr. 685-86.)  He further testified that no promises were made to him for his testimony, and that he did not expect to receive any benefit for testifying.  (Venson Tr. 549.)

4

Petitioner said that they would send "Juggy." (Venson Tr. 605-06.)  Venson knew that Petitioner was referring to Damian Blanding, since Venson had been acquainted with him for a couple of years, and he knew that "Juggy" was Blanding's nickname.  (Venson Tr. 575, 605-06.)  Simpson told Petitioner not to send Blanding because he did not trust him, and he thought that Blanding might steal their drugs and money.  (Venson Tr. 606.) Chebere disagreed, and wanted to send Blanding.  (Venson Tr. 607.)  Six weeks later, Caban went to Chebere's apartment and asked him what was "up with the kid from Ohio," referring to Blanding who had been sent to Ohio to sell the remaining heroin. (Caban Tr. 768.)  Chebere responded that he could not reach Blanding.  (Id.)

On the morning of June 9, 1993, witness Vincent Abbey, the Greyhound ticket agent in charge of the Greyhound bus station in Springfield, Ohio, sold a bus ticket to a young male black in his late teens or early twenties.  (Abbey Tr. 524-28.)  The ticket was for the bus scheduled to depart Columbus at 7:15 a.m. and arrive in New York City at approximately 12:45 a.m. on June 10, 1993.  (Abbey Tr. 528-30.)  At about 7:15 a.m., the man boarded the bus and left the station.  (Abbey Tr. 531.)  About fifteen to thirty minutes later, two black men arrived at the bus station and asked Mr. Abbey whether he had sold a ticket to a black man going to New York City.  (Abbey Tr. 531-32.)  Abbey responded only that he had sold a ticket to New York City.  (Abbey Tr. 531-32.)

Later that afternoon, witness Fred Brown, Damian Blanding's best friend, was in the courtyard of 800 East 180th Street, talking to his friends, Diane Nunn and Malcolm Ross.  (Brown Tr. 448-49, 450-52, 453, 474, 479.)  Chebere, whom Brown had known since the mid-1980s, arrived and joined their conversation.   (Brown Tr. 453-56.) Chebere told Nunn that he received a call from "Rider," who told him that Damian

Blanding had stolen $2,000 from Rider's bag.  (Brown Tr. 453-56, 461, 478-79).[9]  Brown knew Rider but did not know his real name; Brown knew that Rider lived at 181st Street and Vyse Avenue in the Bronx.  (Brown Tr. 459.)  Nunn asked Chebere if he was sure that Blanding had stolen the money, and Chebere said that he was sure.  (Id.)

Chebere asked Nunn if she had heard from Blanding.  (Brown Tr. 454, 456-67.) Nunn told him that if Blanding had left Ohio by bus, he would be arriving in New York, and she told Chebere his expected time of arrival. (Brown Tr. 454-55, 457.)  Chebere walked away with Malcolm Ross, toward a black van parked on the corner of 180th Street and Southern Boulevard; Chebere was upset, and he said that he wanted to talk to Blanding to see if he was lying.  (Brown Tr. 455, 458, 460-61.)  Although Brown did not see Chebere actually get into the vehicle, when Chebere left the area the van was no longer parked on the corner (Brown Tr. 461, 484.)

That same afternoon, witness Edwin Diaz was in front of his residence, located at 2134 Vyse Street, and he was on his way to visit a friend, Mark Anthony; he saw Chebere, whom Diaz had known for five or six years, exit the building and tell him that Damian Blanding had left Rider without any money.  (Diaz Tr. 76-78.)[11]  Chebere told Diaz that he was going to kill Blanding, and he asked Diaz to go with him to the Port Authority Terminal.  (Diaz Tr. 80, 82.)  Diaz said no, and Chebere walked away; Diaz then saw Chebere drive away in a black van.  (Diaz Tr. 84.)

---

[9]At trial, Brown also identified Petitioner and co-defendant Simpson.  He testified that Petitioner and Chebere were brothers, that he had known Simpson since the mid-1980s, and that Petitioner, Simpson and Chebere all  lived at 900 Bronx Park South (Brown Tr. 465-67.)

[11] Edwin Diaz, twenty-four years old at the time of trial, had committed numerous robberies and drug sales in New York and Ohio.  (Diaz Tr. 70-110.)  At the time of trial, he was serving a prison sentence of from 10 to 50 years in Ohio.  (Diaz Tr. 72-73, 122, 148.)

Diaz then walked to East 181st Street, where he met Mark Anthony, and they smoked marijuana.  (Diaz Tr. 84-85.)  Chebere drove the van up to that location, and again asked Diaz if he wanted to go with him; again Diaz said no (Diaz Tr. 85, 89.)  Diaz saw Chebere's brother, Petitioner, whom he had also known from seeing him around the neighborhood for five or six years, sitting in the van next to Chebere.  (Diaz Tr. 68-69.)  Diaz saw a third person in the back of the van, but he could not "make out" that individual.  (Diaz Tr. 86, 133-34.)

Shortly before 8:00 p.m. that evening, witness Caban, who was accompanied by Rafael Ortiz and Lyndon Roland, saw Chebere as he drove the van to 975 East 181st Street.  Chebere told Caban that Damian Blanding was returning from Columbus, Ohio. (Caban Tr. 772, 774, 784.)  Chebere said that "[t]he kid from Columbus, Ohio he's on his way over here," and that Blanding would have their money.  (Caban Tr. 775.)  Chebere said that Rider had telephoned and that Blanding was on his way back to the Port Authority bus terminal in Manhattan, having left Rider asleep in Ohio.  (Caban Tr. 778, 810, 1122.)  Ortiz, who was owed money, told Chebere that he, Caban and Roland would accompany Chebere to the Port Authority.  (Caban Tr. 777.)  Roland and Ortiz each carried a gun.  (Caban Tr. 777-80.)  Caban, Ortiz and Roland followed Chebere back to the van, and as Chebere got into the driver's seat, Caban saw Petitioner in the front passenger seat and Simpson in the back.  Chebere then drove the van to the Port Authority Bus Terminal on 42nd Street and 8th Avenue in Manhattan; Caban, Ortiz, and Roland got into the Buick and followed the van. (Caban Tr. 782-83, 817.)  They arrived at about 9:00 p.m., parked their vehicles, and Caban, Chebere and Ortiz went into the bus

terminal; Petitioner and Simpson remained in the van while Roland remained in the Buick. (Caban Tr. 784, 818, 823.)

Inside, they waited for Blanding's bus, which arrived shortly after midnight (Caban Tr. 822-23.) Damian Blanding was the last passenger to exit the bus; he was carrying a bag. (Caban Tr. 824, 836.) Caban, Chebere and Ortiz approached Blanding, and Blanding said that he had the money and a gun in his pocket, and he suggested that they leave the terminal. (Caban Tr. 825-26.) They went to their vehicles, where Blanding said that he had $2,000 or $2,500, which he handed to Caban. (Caban Tr. 832-33, 838, 973, 1023.) Chebere and Caban asked Blanding what he had done with the rest of the money, and Blanding said he spent it, but was willing to work it off. (Caban Tr. 833-34.) Chebere told him to get into the van. (Caban Tr. 834, 1030.)

Blanding got into the back of the van, bringing his bag with him. Petitioner ordered him to "strip"; Blanding complied. (Caban Tr. 835, 837, 840-41, 1030.) Simpson searched his pockets looking for more money, but Blanding did not have any more. (Caban Tr. 835.) When Simpson asked Blanding what he had done with the rest of the money, he repeated that he had spent it, but would work to repay his debt. (Caban Tr. 835-36, 843.) At that point, Blanding was naked. Simpson and Petitioner began to hit him. Blanding covered his head with his hands, and said "Please, stop. Let me work it off." (Caban Tr. 836, 842-44.) While Petitioner hit and kicked Blanding, Simpson searched his bag. (Caban Tr. 836, 840, 844-45.) Blanding was screaming and crying, saying, "Please, let me work it off," but Petitioner told him, "I'm going to kill you. You better find that money." (Caban Tr. 844.) Caban told the others that they had to stop what they were doing, because there were too many people in the area, including police

officers.  Chebere said he was going to drive to a place under the West Side Highway, and that the others should follow (Caban Tr. 844-45, 849.)  Caban and Ortiz returned to the Buick and drove behind the black van.

With Chebere driving, the van drove up the West Side Highway to the 125th Street exit.  (Caban Tr. 845, 847-50.)  There, Petitioner told Chebere that they had to kill Blanding because he could not return to his "block" beat up.  Petitioner also said that they did not want a "problem" to arise between the residents of 900 Bronx Park South (where Petitioner and Chebere lived) and 800 East 180th Street (where Blanding lived).  (Caban Tr. 851-52.)  Petitioner said they should kill him where they were, but Chebere said that they could kill him by throwing him out of the moving van; Petitioner said he had a better place -- the Whitestone Bridge.  (Caban Tr. 852-53, 856-57, 966-68.)  As Petitioner and Chebere spoke, Blanding remained in the van, naked, and continued to ask them, "Please, let me work it off."  (Caban Tr. 853, 855.)  Simpson was in the van, sitting on one of the rear chairs, blocking Blanding from running out of the van.  (Caban Tr. 851, 855-56.)  Chebere told him to get dressed, and Blanding did as he was told.  (Caban Tr. 853, 855-56.)

Chebere then got back into the van's drivers seat, Petitioner got into the passenger's seat, and Caban returned to his car.  (Caban Tr. 857.)  They drove to the Whitestone Bridge (Caban Tr. 857-58), where they took a side road to a park under the bridge.  (Caban Tr. 858-60.)  It was 2:30 or 3:00 a.m. on the morning of June 10, 1993. (Caban Tr. 879.)  There, after the men got out of the van, Ortiz handed Chebere a gun and Chebere walked back to the van; minutes later, Caban heard five back-to-back shots. (Caban Tr. 871-72.)  Shortly thereafter, Chebere walked toward them and said that his

brother, Petitioner, had just killed Blanding; Chebere was nervous and pale.  (Caban Tr. 872-73; 878-80.)  Chebere gave the gun back to Ortiz, who wrapped it in a rag and handed it to Roland, who stored it in the Buick.  (Caban Tr. 872-73.)  Both cars then drove to a car wash on East Tremont Avenue (Caban Tr. 874-75); the van pulled up next to the Buick, and Petitioner told Caban that he had shot "that nigger," referring to Blanding.  (Caban Tr. 874.)

At the carwash, Chebere told Caban that he was going to get rid of Blanding's bag.  Petitioner again told Caban, "I shot that nigger.  I killed him."  (Caban Tr. 875-76, 885-86.)  Caban, Oritz and Roland then left Petitioner, Simpson and Chebere at the car wash, and they drove back to 975 East 181st Street.  (Caban Tr. 875, 885, 888-90.)  At the apartment, Caban cleaned the gun used to kill Blanding, wiped off any fingerprints, and threw the remaining bullets into a nearby sewer.  (Caban Tr. 890-91, 918.)  Caban split Blanding's money between himself, Ortiz and Roland.   (Caban Tr. 893, 1023.)  Following the murder, Chebere returned the van to its owner, Anthony Roman.  (Roman Tr. 1268-69.)

At about 8:00 a.m. on the morning of the murder, June 10, 1993, witness Police Officer Christopher Andreacchi, answering a radio call, went to Ferry Point Park.  (Andreacchi Tr. 256, 259-60, 262-63.) There, Officer Andreachhi and witness Detective Francis Harten examined Damian Blanding's body.  (Harten Tr. 181, 183-85; Andreacchi Tr. 262.)  Blanding was lying on the ground, on his left side, wearing a Chicago Bulls jersey, black T-shirt and blue jeans, sneakers, and boxer shorts.  (Andreacchi Tr. 262, 264-65.)  Officer Andreacchi and Detective Harten saw that Blanding had been shot in the face, at least two times, and that there was a lot of blood directly under his head,

which indicated to the detective that Blanding was shot at the scene.  (Andreacchi Tr. 165; Harten Tr. 209, 214, 216-18.)   Officer Andreacchi found $1.90 in Blanding's pocket, a receipt for the Greyhound bus ticket purchased on June 9, 1993 in Springfield, Ohio, a ticket envelope, two Greyhound baggage claim checks, and a driver's license belonging to a white female.  (Andreacchi Tr. 297-98, 302.)   A deformed aluminum-jacketed lead bullet was found under Blanding's body.  (Harten Tr. 208, 210-211; Andreacchi Tr. 292-93.)

That same morning, James Venson learned from his girlfriend that Blanding had been killed.  (Venson Tr. 587, 598, 608, 676, 694.)  Venson then went to 181st Street and Daly Avenue to sell drugs, where he saw Simpson (Venson: T. 607-08).  Simpson told him that he met Blanding at the Port Authority Bus Terminal when Blanding returned from Ohio.  (Venson Tr. 608.)  Simpson said that he put Blanding in a black van, asked him for the money, took $2,500 and his gun from him, and beat him up.  (Venson Tr. 608.)  Simpson also told Venson that he took Blanding to the Whitestone Bridge, and there watched as Blanding was shot in the head at point-blank range until the gun was empty.  (Venson Tr. 608-09.)   Simpson said, "Nobody, you know, [will] be able to recognize him.  It will be a closed casket."  (Venson Tr. 608-09.)

About two or three weeks later, Venson and Simpson had another conversation, this time in the home of Mable Norman, the mother of Venson's child.  Simpson told Venson that he was "tired of running" from Blanding's murder, and hoped "they" did not catch him or find out about the murder.  (Venson Tr. 610-13.)  Simpson told Venson that someone in Ohio had called either him, Petitioner, or Chebere, and that was how they learned that Blanding had stolen the drugs and money.  Simpson repeated that he met

11

Blanding at the Port Authority Bus Terminal, put him in a black van, took $2,500 and a gun, stripped him, and beat him, and then took Blanding to the Whitestone Bridge, where Simpson witnessed him being shot in the head.  (Venson Tr. 613-14.)

On July 28, 1995, a little more than two years after the murder, Venson was in the C-95 section of the Rikers Island jail, awaiting a visit from his uncle.  (Venson Tr. 614.) When he entered the visiting room to change into the required jumpsuit, he saw Petitioner.  (Venson Tr. 616.)  Venson told Petitioner that he had "come down on another case."   They discussed everyone on "the block," and then Venson asked Petitioner, "Well, why you here?"   Petitioner said, "For that Juggy [Damian Blanding] shit." (Venson Tr. 615.)  Venson asked Petitioner, "What do you mean," and Petitioner replied, "For the murder of Juggy," "For killing that kid."  (Venson Tr. 615-16.)  Venson asked Petitioner, "What kid?," and defendant said, "That Juggy shit."  (Venson Tr. 616.)

About three years after the murder, during the first week of February 1996, witness Nick Quinones was in the Bronx House of Detention following a drug arrest.[31]

---

[31]Quinones, twenty-five years old at the time of trial, testified that in Florida, on December 7, 1995, he pled guilty to Petty Theft for stealing a remote control car from a K-Mart.  After his arrest, Quinones failed to appear in court because he had gone to New York, and a warrant was issued for his arrest.  He stated that he was extradited back to Florida, and was sentenced.  (Quinones Tr. 1323, 1325-26, 1355-57.)  Thereafter, in the Bronx, on January 1, 1996, he sold three bags of heroin to an undercover police officer, was convicted of Attempted Criminal Sale of a Controlled Substance in the Third Degree, and was sentenced to five years probation.  (Quinones Tr. 1323-25, 1330, 1370-73.)  Quinones testified that in 1993, he managed a "drug spot," and sold crack and heroin (Quinones: T. 1358.)

Quinones further informed the jury that he had testified in an unrelated trial regarding the murder of Arthur Massey on September 12, 1993 at 2147 Honeywell Avenue.  Quinones was referring to the murder of Arthur Massey, for which co-defendant Simpson stands convicted.  See People v. Simpson, 262 A.D.2d 177 (N.Y. App. Div. 1st Dept. 1999).  Quinones informed the jury that he went to a party at that location, carrying a gun for protection.  A friend asked him for the gun, and he later found out that the gun was used in a murder.  Quinones stated that he saw one of his friends hold the victim while another friend shot him in the head.  (Quinones Tr. 1326-27, 1360, 1376-77.)  Quinones testified that in that case he had initially denied to both a detective and an assistant district attorney that he had been in possession of the gun or witnessed the shooting because the defendants in that case had threatened his family.  (Quinones Tr. 1361-64, 1386-87.)  Quinones further informed the jury that, in that case, in exchange for his testimony he was promised release from jail, immunity regarding the gun, and a sentence of five years probation in his

While he was on the third floor, awaiting transfer to the sixth floor, he saw Chebere. (Quinones Tr. 1324, 1330-31, 1353-54, 1370, 1373, 1385.)  He had known Chebere and Petitioner for about four years from the 900 Bronx Park South neighborhood, and he had known Simpson for about five years.  Quinones also knew that Petitioner and Simpson were friends.  (Quinones Tr. 1336-40.)  Chebere asked him why he was in jail, and Quinones told him that he had been arrested on a drug charge, and might be held on a murder charge.  (Quinones Tr. 1331-32.)  Chebere then said "they just brought me down from Schenectady" for "that 1993 Juggy [Damian Blanding] Whitestone body." He also said, "I think my man, Jose [Caban], snitched on me," and that he had seen "Jose" in jail. (Quinones Tr. 1332.)  Chebere told Quinones that Blanding "owed me money, so I picked him up in my van in the Port Authority and then he was stripped, beaten in the van."  Chebere also said that they took Blanding's money, and then drove him to the Whitestone Bridge, where they shot him five times in the head, emptying the gun. (Quinones Tr. 1332.)  Chebere said that if Quinones would provide an alibi for him, he would provide one for Quinones.  (Quinones Tr. 1332-33.)  Chebere also said that he was going to "pin it" on Jose, and told him to give Jose a message.  (Quinones Tr. 1333-35.)

When Quinones was sent to the sixth floor, he saw Jose Caban.  (Quinones Tr. 1334-35).  Although Quinones had not known who Chebere had been referring to, when he saw Caban, he recognized him from 900 Bronx Park South; he had seen Caban, on more than one occasion, stand outside of the building and call up to Chebere, and had seen Chebere stick his head out of this third-floor window and say that he would come

---

drug case (Quinones: T. 1328, 1375-76, 1378-97).  Quinones stated that no promises were made to him for his testimony in this case.  (Quinones Tr. 1329.)  He stated that he had nothing against Chebere.  (Quinones Tr. 1389.).

downstairs.  (Caban Tr. 913-15; Quinones Tr. 1335-36.)  Caban did not know Quinones, but they spoke to one another.  (Caban: T. 913-15.)

Two days later, still in the Bronx House of Detention, Caban saw Chebere (Caban Tr. 915-16.)  Chebere told him to keep his head up and not to say anything about the Whitestone Bridge matter; Caban said he would not say anything.  (Caban Tr. 917.)

ii. *Petitioner's case*

Co-defendant Simpson called witness Detective John Reillo, who testified that he was assigned the homicide case on June 10, 1993.  (Reillo Tr. 1397-98.)  Detective Reillo stated that in Ohio, on Sepetember 23, 1994, he and Detective Miraglia interviewed Caban; however, the detective further stated that he had no independent recollection of the interview and had to refer to his notes in order to testify.  (Reillo Tr. 1397-98, 1400-02, 1405-06, 1414-16.)  The detective testified that he made his notes as Caban spoke, and said that Caban indicated that three individuals, one an unknown black, drove in an old, beat-up, black van to the bus terminal.   (Reillo Tr. 1404-06, 1408, 1410-11.) Detective Reillo further testified that according to his notes, on December 23, 1993, Caban also referred to an unknown black, and that to him, "unknown" could mean either that Caban knew the individual by sight but not by name, or that Caban had not known the individual.  (Reillo Tr. 1411-12, 1415.)

Co-defendant Hector Chebere presented alibi evidence <u>via</u> himself (Chebere Tr. 1520-1585), and witness Helene DiMatteo. (DiMatteo Tr. 1432-91).  They both asserted that Chebere lived in DiMatteo's home, in Schenectady, New York, from Spring 1993 to Spring 1994, and that he was in her home on June 9-10, 1993.  DiMatteo remembered the dates because, although that had been a busy week, on June 8, Chebere told her that his

birthday was June 9, and that night, she served dinner and a cake for him  (DiMatteo Tr. 1435-36, 1441-44, 1452; Chebere Tr. 1523, 1534, 1552, 1561.)   They both also contended that DiMatteo drove Chebere to New York, for the day, three to five times during that time period, and that she drove him to the Bronx on June 16, 1993, when his baby was born.  (DiMatteo Tr. 1435-37, 1461-62, 1474; Chebere Tr. 1534-35.)

iii. *The People's Rebuttal*

The People rebutted Chebere's alibi defense through witness Rochelle Fralin, Damian Blanding's girlfriend.  Each day during the approximately two weeks preceding Blanding was murdered, she saw Chebere in Anthony Roman's black van, on 180th Street and Southern Boulevard in the Bronx.  (Fralin Tr. 1587-89, 1591.)  On June 9, 1993, at about 8:00 p.m., she went to the C-Town store at 180th and Southern Boulevard, and saw Chebere sitting in the black van across the street from the store.  (Fralin Tr. 1591-92, 1594-95.)

**II. Procedural History**

A. State Court Appeals

Petitioner was convicted on October 29, 1998, and sentenced on November 30, 1998.  On direct appeal to New York State Supreme Court, Appellate Division, First Department, Petitioner challenged his conviction on three grounds: 1) that his conviction was based on insufficient evidence because the testimony of the accomplice, Jose Caban, was not corroborated by truly independent evidence tending to connect Petitioner with the crime; 2) that his conviction was against the weight of the evidence, and; 3) that Petitioner's federal and state constitutional rights were violated when the prosecutor

deliberately elicited false testimony from witness James Venson, and then failed to correct what she knew to be false.

On October 18, 2001, the Appellate Division unanimously affirmed Petitioner's judgment of conviction, ruling that:

> The verdict was based on legally sufficient evidence and was not against the weight of the evidence. Defendant's arguments are similar to arguments previously rejected by this Court on a codefendant's appeal (People v Simpson, 284 AD2d 238) and there is no reason to reach a different result here. Defendant's claim that the testimony of an accomplice was insufficiently corroborated is unpreserved and we decline to review it in the interest of justice. Were we to review this claim, we would find that there was extensive corroborating evidence supplied by two non-accomplice witnesses (see People v Daniels, 37 NY2d 624, 629). Defendant's challenges to the corroborating evidence raise credibility issues that were properly for the jury to resolve.
>
> Defendant's claim that the People deliberately elicited "false" testimony is unpreserved and we decline to review it in the interest of justice. Were we to review this claim, we would find it to be without merit. Defendant complains that at the instant trial a fellow inmate testified to a conversation with defendant in which defendant made admissions concerning the murder in question, whereas at defendant's prior trial for attempted murder and related crimes, the inmate testified about the same conversation, but testified only as to defendant's admissions concerning those crimes, omitting any mention of the murder.
>
> At each of the two trials, all parties were careful to avoid eliciting uncharged crimes, so at each trial the inmate witness was only questioned about the pertinent portion of defendant's jailhouse admissions. This was known to defendant, and defendant was free to explore this at the instant trial. It had nothing to do with the People's obligations concerning "false" testimony (People v Smith, 248 AD2d 148; People v Fisher, 244 AD2d 191, lv denied 91 NY2d 891).

People v. Martinez, 287 A.D.2d 353 (N.Y. App. Div. 1st Dept. 2001).  In a letter dated October 30, 2001, and supplemented by a letter dated November 21, 2001, Petitioner applied to the New York Court of Appeals for a certificate granting leave to appeal the Appellate Division's decision on each of the claims raised below.  On December 29,

2001, the Court of Appeals denied Petitioner's leave application.  See People v. Martinez, 97 N.Y.2d 685 (2001).

  B. Petitioner's 440 Motion and His Petitions for a Writ of Habeas Corpus.

  By letter dated July 7, 1999, Petitioner's co-defendant at trial, Hector Chebere, made a FOIL request to Respondent, which included a request for any interview notes of Nick Quinones, one of the People's witnesses at trial, as well as requests for other documents pertaining to the prosecution's witnesses.  (Third Response ¶4; Petitioner's Motion to Renew or Reargue his NYCPL § 440.10 motion ("Motion to Renew"), dated April 28, 2006, Ex. O [Decision of Justice Norma Ruiz, dated November 29, 2004] p. 2.)[3] In response, the People provided 481 pages of documents which referenced Quinones, including plea, sentence, and trial transcripts, and appellate briefs; the People withheld some interview notes of Quinones, stating that they were witness statements made in confidence.  (Third Response ¶4.)  Chebere was advised that he could appeal the withholding of these documents, which he did, and when his appeal was denied, he sought review in the Bronx Supreme Court, pursuant to NYCPLR Article 78.  (Id.)

  On November 21, 2000, after Petitioner was sentenced, but before he perfected his direct appeal, Petitioner submitted a FOIL request to the People.  (Third Response ¶5; Third Response, Ex. 1 [FOIL Request].)  Petitioner requested: copies of cooperation agreements between the Bronx County District Attorney's Office and witnesses James Venson, Nelson Camacho, and Quinones, police memo book entries regarding statements they may have made, notes and reports of any statements they may have made, records of their criminal histories, any additional cooperation agreements with the prosecutor's

---

[3] Petitioner's April 28, 2006 motion to renew his NYCPL 440.10 motion is attached as Exhibit 1 to Respondent's Second Response.

office, any records concerning identification procedures, and any documents evidencing that a reward was offered by the victim's family.  (Third Response, Ex. 1.)

On August 9, 2001, the People provided Petitioner with 205 pages of documents pursuant to his FOIL request.  (Third Response, Ex. 2 [FOIL disclosure].)  Respondent produced a number of documents related to witnesses at Petitioner's trial, and as pertinent here, produced a copy of the cooperation agreement between Respondent and Quinones, a plea transcript in the matter of Respondent against Quinones, and a sentencing transcript in the matter of Respondent against Quinones.  (Id.)  Petitioner did not appeal the People's disclosure.  On August 26, 2002, pursuant to Chebere's application under NYCPLR Article 78, Bronx Supreme Court Justice Ruiz conducted a "careful review of the records before it," and upheld the "District Attorney's choice to reveal 481 documents turned over prior to this judicial proceeding and Respondents' decision to withhold or redact such information as might indicate a specific location of a particular witness at trial."  (Motion to Renew, Ex. O at 2.)

In *pro se* papers dated November 21, 2002, Petitioner filed a Motion to Vacate his conviction pursuant to New York Criminal Procedure Law ("NYCPL") § 440.10 ("440 motion").  (First Response, Ex. 3 [Petitioner's 440 motion].)  Petitioner asserted that his due process rights under both the New York and Federal constitutions were violated by the prosecutor's misconduct both in preparation for and at his trial.  Specifically, Petitioner contended that at trial, the prosecutor: failed to investigate prosecution witness James Venson's criminal record, which would have alerted the prosecutor that Venson would testify falsely about conversations with Petitioner and co-defendants Chebere and Simpson concerning possible drug sales in Ohio; failed to notify the court that Venson

had testified falsely about these drug-related conversations; threatened Juan Ortiz (not a witness in this case) to testify falsely against Louis Bracero for the murder of German Morales (an unrelated matter in which Petitioner was not involved); threatened prosecution witness Nick Quinones to testify in three trials, the murder of Arthur Massey (an unrelated matter in which Petitioner was not involved), the attempted murder and robbery of Michael Smith (for which Petitioner stands convicted), and the instant matter here involving the killing of Damian Blanding, and; withheld material concerning Nick Quinones that should have been received pursuant to People v. Rosario, 9 N.Y.2d 286 (1961) ("Rosario material").[4]   (Id. at 7-13.)   The prosecutor submitted a response to Petitioner's motion on March 5, 2003 (First Response, Ex. 4 [440 motion response]), to which Petitioner replied on March 24, 2003.   (First Response, Ex. 5 [Petitioner's 440 motion reply papers].)   In his reply papers, Petitioner expanded on his Nick Quinones Rosario claim, writing that circumstances before, during, and after trial, indicate that Nick Quinones had a cooperation agreement to testify at Petitioner's trial, and that the prosecutor withheld Rosario material proving the existence of that agreement.  (Id.)

On June 11, 2003, Justice Harold Silverman of the Supreme Court of the State of New York, Bronx County, denied Petitioner's November 21, 2002 440 motion, ruling that Petitioner's claims of prosecutorial misconduct had been found on appeal to be unpreserved, and therefore, procedurally barred from collateral review pursuant to NYCPL § 440.10(2)(a), which prohibits collateral review of claims raised and decided

---

[4] In the 1961 case of People v. Rosario, 9 N.Y.2d 286 (N.Y. 1961), the New York Court of Appeals ruled that the prosecution at trial must turn over to the defense all statements of a prosecution witness relating to the witness's trial testimony.  The Court of Appeals issued its ruling on state grounds, and compared it to the disclosure required under U.S. Code, tit. 18, § 3500 and Jencks v. United States, 353 U.S. 657, 667 (1957).

upon on direct review.  (First Response, Ex. 7 [440 motion decision].)  Justice Silverman also determined that any claim not raised on Petitioner's direct appeal was procedurally barred by NYCPL § 440.10(2)(c), which prohibits collateral review of claims that could have been raised on direct appeal but were not, and that the claim involving Juan Ortiz was procedurally barred by NYCPL §440.30(4)(b), which permits judges to deny 440 motions that do not contain "sworn allegations substantiating … all essential facts."  (Id.) In *pro se* papers dated July 9, 2003, Petitioner applied to the Appellate Division, First Department, for permission to appeal the June 11, 2003, denial of his 440 motion, on each and every one of his claims raised in that motion.  (First Response Aff. ¶13.)

On January 15, 2004, the New York State Supreme Court, Appellate Division, First Department, remanded Chebere's initial FOIL request back to the Bronx Supreme Court for an *in camera* inspection of Respondent's files.  See Chebere v. Johnson, 3 A.D.3d 365 (N.Y. App. Div. 1st Dept. 2004).

On April 6, 2004, the Honorable Eugene L. Nardelli, a Justice of the Appellate Division, First Department, denied Petitioner permission to appeal the June 11, 2003 denial of his NYCPL 440.10 motion.  (First Response, Ex. 8 [denial of 440 motion leave to appeal].)

On July 14, 2004, Petitioner filed the instant petition for a federal writ of habeas corpus, asserting all of the same claims he raised in his direct appeal, as well as the issues in his 440 motion.  On November 22, 2004, Justice Ruiz issued her decision announcing the results of her *in camera* review of the Bronx County District Attorney's files in the instant matter, conducted in response to co-defendant's Chebere's FOIL request. (Petitioner's Motion to Renew, Ex. O.)  In her decision ruling that Respondent had fully

complied with the FOIL rules, Justice Ruiz stated, in pertinent part, that the Bronx District Attorney's Office had supplied: "notes taken during interviews of Quinones by ADAs and 48th Pct. Detectives.  These items all refer to the witness Quinones and reports generated through interrogation of, or 'deals' made, with him."  (Id.)  Justice Ruiz further determined that several documents were exempt from disclosure, including the criminal record of the witnesses, the prosecutor's notes taken in preparation for trial, and addresses, names and personal information of the family or friends of witnesses.  (Id.)

On August 1, 2005, Respondent filed a response to the habeas petition with an affidavit in opposition and a memorandum of law, which argued that many of Petitioner's claims were procedurally barred or not cognizable on habeas review, and that all of Petitioner's claims were meritless.  (First Response.)  On April 3, 2006, Petitioner notified this Court of Justice Ruiz's decision concerning Chebere's FOIL request. (Motion to Renew, Ex. N [letter from Petitioner to Court].)  Upon receipt of Petitioner's letter, this Court, by an order dated April 7, 2006, notified Respondent of Justice Ruiz's decision and ordered Respondent to provide Petitioner with a copy of the decision.  (Id.)

By *pro se* papers dated April 28, 2006, Petitioner moved to reargue or renew his 440 motion, which had been denied by the Bronx Supreme Court on June 11, 2003. (Second Response, Ex. 1 [Motion to Renew].)  In his motion, Petitioner argued that his claim in his initial 440 motion, that the prosecutor had withheld Rosario material pertaining to witness Nick Quinones (the alleged cooperation agreement as well as additional interview transcripts) was now supported by the November 22, 2004 decision of Justice Norma Ruiz of the Bronx Supreme Court.  In pertinent part, Justice Ruiz's decision referred to "notes taken during interviews of Quinones by ADAs and 48th Pct.

Detectives," and "deal<u>s</u>" made with him Quinones.  (Motion to Renew, Ex. O [emphasis added].)  Petitioner claimed that he had been provided only with a single set of notes and with notes of only a single "deal" relating to the murder of Arthur Massey, whereas Justice Ruiz's decision indicated that multiple cooperation agreements were made and that additional notes existed.  (Petitioner's Motion to Renew.)  In his motion, Petitioner articulated this claim as a <u>Brady</u> violation.  (<u>Id.</u> at 7-8, 16-20.)

That same day, April 28, 2006, Petitioner filed an amended petition for habeas corpus with this Court, asserting the same claims raised in his concurrent motion to reargue or renew.  The People responded to this amended petition on September 18, 2006.  (Second Response.)

On December 7, 2006, Petitioner's motion to reargue or renew his 440 motion was denied by the Honorable Caesar Cirigliano of New York Supreme Court, Bronx County.  (Third Response, Ex. 3 [12/07/06 Decision of Justice Caesar Cirigliano].)  In denying Petitioner's motion to reargue, Justice Cirigliano found that it was untimely and that it improperly included "matters of fact not offered on the prior motion."  (<u>Id.</u> at 3.)  In denying Petitioner's motion to renew, Justice Cirigliano noted that Justice Silverman had previously denied Petitioner's motion on procedural grounds pursuant to NYCPL § 440.10(2)(c), which mandated that Petitioner should have raised the issue of prosecutorial misconduct on direct appeal.  (<u>Id.</u> at 3-4.)  Justice Cirgliano determined that despite Petitioner's assertion of "new facts that may or may not result in leave to renew, the procedural stumbling block remains."  (<u>Id.</u>)

By order dated January 22, 2007, after Justice Cirigliano's decision had been rendered, but while that decision was pending on review by the New York State Supreme

Court, Appellate Division, First Department, this Court granted a stay of Petitioner's *habeas corpus* proceedings so that Petitioner could fully exhaust "issues about materials not made available to the defense prior to trial and concerning the ability of the defense to cross-examine a key witness." (Third Response Aff. ¶11.)

On July 19, 2007, Justice James McGuire of the New York Supreme Court, Appellate Division, First Department denied Petitioner's subsequent application for leave to appeal Justice Cirigliano's denial of his motion to reargue or renew. (Third Response, Ex. 4 [letter denying leave to appeal].)  On October 15, 2007, Petitioner filed a second amended petition, alleging two new claims: in the first claim, titled "Ground Nine," Petitioner alleges that the state court's failure to inspect documents likely constituting Brady material violated his right to due process; in the second new claim, titled "Ground Ten," Petitioner alleges that his trial counsel rendered ineffective assistance by failing to investigate the "facts produced by the main coaberating [sic] witness's [Quinones'] testimony."  (Second amended petition, dated October 15, 2007, pp. 15-29, 30-35.) Respondent filed a response to Petitioner's amended petition on February 21, 2008. (Third Response.)

## III. Governing Law

### A. Habeas Corpus Petitions

A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in the state courts unless the state court's adjudication: "1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or 2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."  See 28 U.S.C. § 2254(d).

For a claim to be adjudicated "on the merits" within the meaning of 28 U.S.C. § 2254(d), it must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other ground."  Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001).  As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered to be "adjudicated on the merits" even if it fails to mention the federal claim and no relevant federal case law is cited.  Aparico v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001); see also Rosa v. McCray, 396 F.3d 210, 220 (2d Cir. 2005).  Moreover, a state court's determination of a factual issue is "presumed to be correct," and that presumption may be rebutted only "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court held that a state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result.  Williams, 529 U.S. at 405-06.  The Supreme Court also held that habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  A federal court may not grant relief "simply because that court concludes in its independent judgment

that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the state court's application must have been "objectively unreasonable." Id. at 409. Only holdings of the Supreme Court are considered for purposes of determining "clearly established Federal law." See Rodriguez v. Miller, 537 F.3d 102, 106-07 (2d Cir. 2008).

B. Procedural Default

Before a federal court may issue a writ of habeas corpus to an individual detained following a conviction in a state court, a petitioner must have exhausted all possible state remedies by presenting his claims in federal constitutional terms to the "highest state court from which a decision can be had." Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 191 n.3 (2d Cir. 1982); see also 28 U.S.C. § 2254(b) (1) (A); Baldwin v. Reese, 541 U.S. 27, 29 (2004) ("the prisoner must fairly present his claim in each appropriate state court, including a state supreme court with powers of discretionary review.") Although a petitioner need not explicitly refer to federal constitutional rights in an appeal to state courts, he must clearly alert the court to the federal constitutional or statutory issues raised by the case prior to seeking a writ of habeas corpus from a federal court. Daye, 696 F.2d at 192-93; see also Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (the petitioner must also have fairly presented the "federal nature" of each claim to the state courts.)

All claims must also be brought in accordance with state procedural rules, such that the state courts have had a fair opportunity to adjudicate the claims prior to federal intervention. See Wainwright v. Sykes, 433 U.S. 72, 81-82, 84 (1977). As such, a colorable federal constitutional claim may be barred from habeas relief in federal court if

the claim was denied by a state court on a state procedural ground that is both "independent" of the merits of the federal claim and an "adequate" basis for the court's decision.  See Coleman v. Thompson, 501 U.S. 722, 729 (1991); Harris v. Reed, 489 U.S. 255, 260-61 (1989); Garcia v. Lewis, 188 F.3d 71, 78 (2d Cir. 1999).  For a state law ground to be "independent and adequate," the state appellate court "must actually have relied on the procedural bar as an independent basis for its disposition of the case."  Fama v. Comm'r of Corr. Services, 235 F.3d 804, 809 (2d Cir. 2000).

A petitioner can avoid such a default if he is able to show both good cause for his failure to meet state procedural requirements, and that his failure to meet those requirements actually prejudiced the outcome of the case.  Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991) ("[P]etitioner's forfeiture in state court of his … claims bars him from litigating the merits of those claims in federal habeas proceedings, absent a showing of cause for the procedural default and prejudice resulting therefrom.")  Cause exists if "the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  Murray v. Carrier, 477 U.S. 478, 479 (1986); see also McCleskey v. Zant, 499 U.S. 467, 493 (1991).  Examples of "cause" may include interference by outside officials or the unavailability of a defense because of its constitutional novelty.  See Fernandez v. Smith, 558 F. Supp. 2d 480, 490 (S.D.N.Y. 2008) (citing Strickler v. Greene, 527 U.S. 263, 293 n.24 (1999)). The "prejudice" requirement is met by a showing of "actual prejudice resulting from the errors of which [petitioner] complains."  United States v. Frady, 456 U.S. 152, 168 (1982).  The error must have resulted in "substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions."  Murray, 477 U.S. at 494.

**IV. Discussion**

We now address each of the claims raised in the petition.

A. <u>Weight of the Evidence</u>

Petitioner first claims that he should be granted habeas relief because his conviction was against the "weight of the evidence."   (Habeas Petition, Point 2.) "Weight of the evidence" claims stem from New York CPL § 470.15(5), which allows an intermediate appellate court to reverse or modify a conviction where the court determines that the verdict was, "in whole or in part, against the weight of the evidence," meaning that the "trier of fact has failed to give the evidence the weight it should be accorded." <u>See</u> <u>People v. Bleakley</u>, 69 N.Y.2d 490, 495 (N.Y. 1987) (distinguishing weight of the evidence claims from claims based on the legal sufficiency of the evidence).

However, federal habeas review is not available to address errors involving state law.  <u>See</u> 28 U.S.C. 2254(a) ("a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of Constitution or laws or treaties of the United States.")  Accordingly, as weight of the evidence claims are solely creatures of state law, it is well-established that a weight of the evidence claim is not cognizable on federal habeas review because it does not present a federal constitutional issue.  <u>See, e.g.</u>, <u>Taylor v. Poole</u>, 538 F. Supp. 2d 612, 618 (S.D.N.Y. 2008) (it is "well established that 'weight of the evidence' claims are not cognizable on federal habeas review, given the difference between such a challenge and that of a challenge based on the sufficiency of the evidence"); <u>Douglas v. Portuondo</u>, 232 F. Supp.2d 106, 116 (S.D.N.Y. 2002) (holding that weight of the evidence claims are not cognizable on federal habeas review).

Petitioner's weight of the evidence claim is therefore rejected.  Moreover, as set forth earlier in this opinion, the evidence at trial was sufficient for a reasonable jury to convict Petitioner.

B. Petitioner's Insufficient Evidence Claim

In arguing that the evidence was legally insufficient to convict, Petitioner contends that, pursuant to New York CPL § 60.22(1) (corroboration of accomplice testimony), Respondent failed to sufficiently corroborate the testimony of Jose Caban, an accomplice to the crimes, because other prosecution witnesses, James Venson and Edwin Diaz, were not credible and their testimonies did not tend to connect Petitioner to the crime.  (Habeas Petition, Point 1.)  Petitioner's claim is procedurally barred, largely not cognizable on federal habeas review, and meritless.

i. *Petitioner's Claim is Procedurally Barred.*

As noted, federal habeas review of a claim is generally prohibited if a state court rests its judgment on a state law ground that is independent of the federal question and adequate to support the judgment.  See Lee v. Kemna, 534 U.S. 362, 375 (2002).  This doctrine applies to rules of state law whether they are substantive or procedural.  See Coleman, 501 U.S. at 729.  A state procedural default qualifies as an independent and adequate state ground when "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." Harris, 489 U.S. at 263 (1989).  Further, where the last "reasoned" state opinion on the claim explicitly imposes the procedural bar, habeas courts will presume that later unexplained orders upholding that opinion "did not silently disregard that bar and consider the merits." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

Here, the Appellate Division denied Petitioner's accomplice collaboration insufficiency of the evidence claim on the ground that it was "unpreserved"; the Appellate Division also "decline[d] to review it in the interest of justice." Martinez, 287 A.D.2d 353.  Hence, in ruling on Petitioner's sufficiency of the evidence claim, the Appellate Division expressly relied upon the contemporaneous objection rule of NYCPL § 470.05(2).  It well-settled that this rule is an independent and adequate state ground, see Garcia v. Lewis, 188 F.3d 71 (2d Cir. 1998); Bossett v. Walker, 41 F.3d 825, 829 n.2 (2d Cir. 1994); Fernandez v. Smith, 558 F. Supp. 2d 480, 489-90 (S.D.N.Y. 2008), which applies to claims that the evidence was insufficient to corroborate an accomplice's testimony.  See People v. James, 75 N.Y.2d 874, 875 (1990) (claim that evidence was insufficient to corroborate accomplice testimony was not preserved because it was not presented at trial); People v. Blaho, 221 A.D.2d 650 (2d Dept. 1995) (same).

Moreover, while the Appellate Division further stated that were "we to review this claim we could find that there was extensive corroborating evidence supplied by two non-accomplice witnesses," that the Appellate Division alternatively considered and rejected the merits of Petitioner's claim is irrelevant to this Court's determination that the claim is procedurally barred.  See Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (if the Appellate Division rejects a claim on procedural grounds, then goes on to state that if it were to review the claim, it would find it to be without merit, that claim is procedurally forfeited and federal habeas review is foreclosed).

To escape from this procedural default, Petitioner must, as noted earlier, either establish cause for the default and prejudice resulting therefrom, or show that a fundamental miscarriage of justice would occur if this Court did not consider his claim.

See Coleman, 501 U.S. at 750; Fama, 235 F.3d at 809.  Here, Petitioner has failed to allege cause, prejudice, or that a fundamental miscarriage of justice would occur if this Court decided not to entertain his claim.  Indeed, Petitioner has proffered no explanation -- other than the fact that the claim is patently meritless -- for failing to preserve his accomplice corroboration insufficiency of the evidence claim.  Nor has Petitioner demonstrated any prejudice because, as explained infra, the claim of insufficient evidence is meritless.  Lastly, since he has not asserted that he is innocent, he cannot establish that a fundamental miscarriage of justice would occur.  Washington v. James, 996 F.2d 1442, 1447 (2d Cir. 1993) (action based upon a fundamental miscarriage of justice is appropriate only "where a constitutional violation has probably resulted in the conviction of one who is actually innocent.")

Accordingly, because the New York Appellate Division decided this issue on independent and adequate state grounds, Petitioner's claim regarding the sufficiency of the evidence is procedurally barred.

### ii. *Petitioner's claim is not cognizable on federal habeas review.*

Generally, a claim that the evidence at trial was insufficient to support a conviction is cognizable under the Due Process Claim of the Fourteenth Amendment, which prohibits a criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime," see In re Winship, 397 U.S. 358, 364 (1970), and therefore, is cognizable on federal habeas review.  See Dixon v. Miller, 293 F.3d 74, 81 (2d Cir. 2002); see also Estelle v. McGuire, 502 U.S. 62 (1991) (a federal court on habeas review decides whether a conviction violated the Constitution, laws, or treaties of the United States).

Petitioner's sufficiency of the evidence claim rests primarily on a New York State statute, New York CPL § 60.22, which requires that accomplice testimony be corroborated.  There is no such federal constitutional requirement.  See Caminetti v. United States, 242 U.S. 470, 495 (1917) (no federal statutory or constitutional rule preventing convictions on the basis of uncorroborated accomplice testimony); United States v. Riggi, 541 F.3d 94, 110 (2d Cir. 2008) (a conviction may be supported only by the uncorroborated testimony of a single accomplice … lack of corroboration goes merely to the weight of the evidence, not to its sufficiency"); Smithwick v. Walker, 758 F. Supp. 178, 186 (S.D.N.Y. 1991) (requirement of accomplice corroboration is solely a product of New York State law).

Accordingly, Petitioner's sufficiency of the evidence claim is not cognizable on federal habeas review because it too rests upon a creation of New York State law.

### iii. *Petitioner's sufficiency of the evidence claim is meritless.*

Even if Petitioner's claim was not barred and was cognizable on federal habeas review, his sufficiency of the evidence accomplice corroboration claim is meritless. When interpreting a state statute, a federal court must defer to the state courts' interpretation of that statute.  United States v. Fernandez-Antonia, 278 F.3d 150, 162 (2d Cir. 2002); see also Rivkin v. Century 21 Teran Realty LLC, 494 F.3d 99, 103-04 (2d Cir. 2007).  NYCPL § 60.22(1) provides that a "defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense."  Interpreting this statute, the New York Court of Appeals has held that the corroborative evidence must be truly independent of the accomplice testimony in that "[i]t may not depend for its weight

and probative value upon the testimony of the accomplice."  People v. Hudson, 51 N.Y.2d 233, 238 (1980); see also People v. Steinberg, 79 N.Y.2d 673, 683 (1992). However, the corroborative evidence need only "connect the Petitioner with the commission of the crime, not prove that he committed it."  Hudson, 51 N.Y.2d at 238; People v. Breland, 83 N.Y.2d 286, 292 (1994).  "All that is necessary is to connect the petitioner with the crime in such a way that the jury may be reasonable satisfied that the accomplice is telling the truth."  People v. Daniels, 37 N.Y.2d 624, 630 (1975); see also Steinberg, 79 N.Y.2d at 683; People v. Glasper, 52 N.Y.2d 970, 971 (1981).

Here, Caban, an accomplice of Petitioner, Chebere, and Simpson, provided the bulk of the testimonial evidence against Petitioner at trial.  However, there was sufficient evidence that corroborated Caban's version of events.  From Caban, the jury learned that Petitioner sent Damian Blanding, the victim, to Ohio to sell his heroin because it was not selling well in the Bronx; that on the evening before the murder, Caban, in one vehicle, accompanied Petitioner and the co-defendants in another vehicle, to collect Blanding at the Port Authority Bus Terminal; that when Blanding admitted to having taken their money, they ordered him into the black van that Petitioner and his co-defendants had been traveling in, beat Blanding, and Petitioner said that he was going to kill Blanding; the group then traveled to a park underneath the Whitestone Bridge, where Chebere was handed a gun, Caban heard five gunshots, and then Chebere told Caban that Petitioner had killed Blanding, and; on the way to the carwash and then again at the car wash, Petitioner told Caban that he had killed Blanding.

Venson corroborated Caban's testimony.  Venson testified that he had engaged in at least two conversations with Petitioner and co-defendants Simpson and Chebere,

during which they discussed selling their drugs in Ohio. In the second conversation, Petitioner suggested they send Blanding to Ohio to sell the drugs. Thus, Venson's testimony demonstrated that Petitioner had a vested interest in the proceeds of the Ohio drug sales, and established that the motive for the murder was Blanding's theft of Petitioner's and his co-defendants' drug money.

Venson also testified that about two years after Blanding's murder, while he and Petitioner were both in a visitors room at the Rikers Island jail, Petitioner admitted that he had killed Blanding. Petitioner told Venson that he was in jail for "that Juggy shit," "For the murder of Juggy," and "For killing that kid." (Venson Tr. 615-16.) Venson testified that he knew Blanding's nickname was Juggy. (Venson Tr. 575, 605-06.) That admission by Petitioner corroborated Caban's testimony that after he heard the five back-to-back gunshots, Chebere returned with the gun, and told Caban that Petitioner had just killed Blanding and that Petitioner had twice admitted to Caban that he had shot and killed Blanding. (Caban Tr. 874-75.)

Diaz also corroborated Caban's testimony. He testified that on the afternoon preceding Blanding's murder, Chebere told him that he was going to kill Blanding for stealing the drug money, and Chebere asked Diaz to go with him to the Port Authority Bus Terminal. (Diaz Tr. 76-78, 80, 82.) Shortly thereafter, Chebere, in a black van, drove up to Diaz and again asked if he wanted to go with him to the Port Authority Bus Terminal to collect Blanding; Petitioner was seated next to Chebere. (Diaz Tr. 68-69, 85, 89.) Thus, Diaz's testimony tended to prove that Caban testified truthfully that Petitioner, with his co-defendants, met Blanding at Port Authority Bus Terminal and robbed, kidnapped, and murdered him.

Lastly, the testimony of Police Officer Chris Andreacchi corroborated Caban's testimony. Officer Andreacchi testified that on the morning after Blanding's murder, he went to the park underneath the Whitestone Bridge where he found Blanding's gunshot-riddled body. The officer further explained that the pooling of blood beneath Blanding's head evinced that Blanding had been shot at the scene. This corroborated Caban's testimony that Blanding had been executed at the park underneath Whitestone Bridge.

Petitioner additionally argues that the corroboration provided by the testimony of Venson and Diaz should not be credited as sufficient corroborating evidence. In that regard, Petitioner first asserts that Venson's "testimony must be discounted because it was fabricated." (Habeas Petition Point 1(a).) However, federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 432 (1983); Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997). Next, relying on People v. Hudson, 51 N.Y.2d 233 (N.Y. 1980), Petitioner contends that the testimony of Diaz was not "truly independent," as required by Hudson, which held that evidence originating from accomplices did not meet the truly independent standard. (Amended Petition, Point III.) However, Diaz and Venson were not accomplices in the murder of Blanding, therefore, Petitioner's reliance on Hudson, 51 N.Y.2d at 233, is misplaced.

Accordingly, Petitioner's claim that the evidence was insufficient to convict him is procedurally barred, not cognizable in this Court, and meritless.

### C. Petitioner's Claims of Prosecutorial Misconduct

Petitioner further asserts that his right to due process was violated by the misconduct of the prosecutor. Petitioner claims that his constitutional rights were denied

when the prosecutor: knowingly used, and subsequently failed to correct, the allegedly "perjured" testimony of James Venson.  (Habeas Petition, Pt. IV; Amended Petition, ¶6, Point 1.)  Specifically, Petitioner contends that his constitutional right to due process of law was violated when the prosecutor suborned perjury on two separate occasions at his trial. The first allegation of perjury occurred when the prosecutor elicited, without correction, James Venson's testimony about conversations he had with Petitioner and co-defendants about the sale of their drugs in Ohio (hereinafter, "drug perjury claim"). The second allegation occurred when the prosecution elicited Venson's testimony regarding his conversation with Petitioner at Rikers Island jail (hereinafter, "jail perjury claim"). Petitioner's claim is procedurally barred, and in any event, meritless.

> i. *Petitioner's claim of prosecutorial misconduct based on perjury is procedurally barred.*

In his initial appeal to the Appellate Division, Petitioner claimed that the prosecutor elicited "false" testimony from witness James Venson when at the instant trial Venson, a fellow inmate of Petitioner, testified to a conversation with Petitioner in which Petitioner made admissions concerning the murder in question, whereas at Petitioner's prior trial for attempted murder and related crimes, Venson testified about the same conversation, but testified only as to Petitioner's admissions concerning those crimes, omitting any mention of the murder of Blanding.  (First Response, Ex. 1, pp. 52-69 [Petitioner's Brief].)  The Appellate Division ruled that this claim was "unpreserved," and that court "declined to review it in the interest of justice."  Martinez, 287 A.D.2d at 353.  The court further determined that were it to "review this claim," it would "find it to be without merit" because "at each of the two trials, all parties were careful to avoid eliciting uncharged crimes, so at each trial the inmate witness was only questioned about

the pertinent portion" of Petitioner's "jailhouse admissions."   (Id.)   This variance in testimony, the court ruled, was "known to [Petitioner], and [Petitioner] was free to explore this at the instant trial.  It had nothing to do with People's obligations concerning 'false testimony.'"  Indeed, for the prosecutor to elicit testimony about uncharged crimes would have been clear error.

In his 440 motion filed on November 21, 2002, Petitioner repeated the claim raised in his appellate brief that the prosecutor suborned perjury by eliciting or allowing, without correction, James Venson to falsely testify about his conversation with Petitioner at the Rikers Island jail.  Petitioner also raised an additional perjury claim, arguing that the prosecutor allowed James Venson to supposedly falsely testify about conversations he had with Petitioner and his co-defendants about Blanding's sale of their drugs in Ohio. The conversations, Petitioner contends, could not have taken place because Venson was incarcerated at the time of the conversations.

On June 11, 2003, Justice Harold Silverman of the Bronx Supreme Court denied Petitioner's 440 motion.  The 440.10 court, in referring to the jail perjury claim, determined that the "grounds proffered by the Defendant on this motion … have been raised on appeal and the Appellate Division declined to review them as the claims were un-preserved."  In denying Petitioner's claim, Justice Silverman was relying on NYCPL § 440.10(2)(a), which states that a motion to vacate a judgment must be denied if the "ground or issue raised upon the motion was previously determined on the merits upon an appeal from the judgment…"  While the 440 court expressly relied upon the statute's procedural grounds, the court simply neglected to explain that the Appellate Division had also rejected Petitioner's claim on the merits.  With regard to the drug perjury claim, the

court ruled simply that "any other issue that defendant has failed to raised [sic] on appeal is deemed procedurally barred pursuant to CPL 440.10(2)(c)," which prohibits the use of a 440 motion to raise issues that could have been raised on direct appeal.

As noted, it is well-settled that federal courts are procedurally barred from reviewing claims where the state court relies upon independent and adequate state grounds for denying relief.  See Jimenez v. Walker, 458 F.3d 130, 149 (2d Cir. 2006).  In denying both of Petitioner's perjury claims, the 440 court, the last state court to render judgment on this issue, relied on New York state procedural Section 440 rules, which under the law of this Circuit, are an "independent and adequate state ground for denying relief."  See, e.g., Sweet v. Bennett, 353 F.3d 135, 140-41 (2d Cir. 2003) (Section 440.10(2)(c) was an adequate and independent state law ground that barred federal habeas review); Levine v. Comm'r, 44 F.3d 121, 126 (2d Cir. 1995) (same); Venable v. Walsh, 2009 U.S. Dist LEXIS 25524 (E.D.N.Y. 2009) (procedural default in 440.10 motion is an independent and adequate state ground for denying relief); Vilsaint v. Burge, 2007 U.S. Dist. LEXIS 25524 (E.D.N.Y. 2007) (same).  Accordingly, as Petitioner has made no showing of cause and prejudice or actual innocence, federal review of Petitioner's prosecutorial perjury claims is barred.

> ii. *Petitioner's perjury claim is rejected.*

However, even if this court were to reach the merits of the Petitioner's claim, his prosecutorial misconduct allegations on the basis of the drug and jail perjury claims would fail. The standard of review for claims of prosecutorial misconduct in a habeas corpus petition is whether the prosecutor engaged in egregious misconduct of such significant significance that it denies the defendant's due process right to a fair trial.

Blissett v. Lefevre, 924 F.2d 434, 440 (2d Cir. 1991).  Here, there has been no showing that the prosecutor engaged in any misconduct, let alone "egregious misconduct" of the sort that deprives the Petitioner of his right to a fair trial.

Petitioner's jail perjury claim is based on his argument that Venson's testimony at the present trial contradicted testimony Venson gave at Petitioner's previous trial.  At the present trial, Venson testified that Petitioner had told him, while both were incarcerated at Riker's Island on July 28, 1995, that he was in jail for the killing of Blanding.  (Venson Tr. 614-615.)  Petitioner claims that this was a perjured statement because at Petitioner's earlier trial for the attempted murder and robbery of Michael Smith, Venson testified that Petitioner had told him that he was in jail for attacking and assaulting Michael Smith. (First Response, Ex. 1 at 57-58.)  Petitioner contends that since the same prosecutor prosecuted Petitioner's earlier case, she was fully aware of the conflicting testimony between the cases, and therefore, should have notified the trial court about the "perjury." (Id.)

However, as the Appellate Division concluded, this discrepancy does not mean that Venson's testimony was perjurious. Rather, "[a]t each of the two trials all parties were careful to avoid eliciting uncharged crimes, so at each trial the inmate witness was only questioned about the pertinent portion of defendant's jailhouse admissions. This was known to defendant, and defendant was free to explore this at the instant trial.  It had nothing to do with the People's obligations concerning 'false' testimony." Martinez, 287 A.D.2d at 354.  Thus, since there was no false testimony, but merely an appropriate parsing of the evidence to prevent undue prejudice, the prosecutor did not suborn perjury.

Petitioner's drug perjury claim also fails to show that the prosecutor actually elicited perjury, and in doing so, engaged in misconduct.  The drug perjury claim is based upon Venson's testimony at the 1998 trial that less than a month before the June 10, 1993 murder of Blanding, Petitioner said to Venson and Petitioner's co-defendants that they were going to send Blanding to Ohio to sell their heroin. (First Response, Ex. 3 at 5-10; Venson Tr. 605). Petitioner maintains that the prosecution elicited perjury because Venson's criminal record indicates that he was in jail for 200 consecutive days between March 30, 1993 and October 15, 1993; therefore Venson could not have heard the conversation when he testified he did.  Petitioner further asserts that because the prosecutor had access to Venson's RAP sheet prior to questioning Venson, she did or should have known that Venson was lying.

However, simply because a witness's testimony might have been later contradicted does not mean that the prosecutor purposefully elicited perjury.  Here, there was a perfectly good explanation for this contradiction: Venson's memory for dates was admittedly poor.  Venson repeatedly testified that he did not remember dates -- not the dates pertinent to his own criminal record (Venson Tr. 555-59, 561, 563-64, 567), nor the dates of the events and conversations at issue that took place five years prior to trial. (Venson Tr. 555, 610-11, 681-85, 693.)  Most notably, Venson even testified that he did not remember being in jail from March 30 to October 15, 1993, even when he was shown documentation to that effect.  (Venson Tr. 670-72.)  Thus the jury was made aware of the discrepancy.  Venson also stated that from 1988 until 1993, he saw Petitioner every day, and that petitioner was like a brother to him.  (Venson Tr. 578, 628.)  Since it is entirely reasonable for an individual not to recall the dates of specific conversations with

someone he or she speaks to on a daily basis, there was nothing unbelievable about Venson's lack of memory about dates.  Therefore, the jury credited Venson's testimony that he had a poor memory about the dates of these conversations and did not lie about those dates, a credibility determination that this Court cannot reassess.  See Marshall, 459 U.S. 422 at 432.

Accordingly, Petitioner's prosecutorial misconduct claim concerning Venson is denied.

D. Petitioner's Rosario/Brady Claims

Petitioner further claims that the prosecutor prejudicially withheld documents regarding prosecution witness Nick Quinones (an alleged second cooperation agreement and notes from Quinones' interviews with the authorities) from Petitioner in violation of People v. Rosario, 9 N.Y.2d 286 (1961), which mandates that the government disclose all relevant statements of a witness, and Brady v. Maryland, 373 U.S. 83 (1963), which mandates that the government disclose all evidence favorable to an accused.

i. *Petitioner's Brady/Rosario Claim is Procedurally Barred.*

As explained, a federal court's authority to review a habeas petition depends on whether the state court adjudicated the petitioner's claim on the merits or on state procedural grounds, see Coleman, 501 U.S. at 729-30, and generally, a claim resolved on independent and adequate state procedural grounds is not subject to review on habeas. See Coleman, 501 U.S. at 729-30; Jimenez v. Walker, 458 F.3d 130, 138 (2d Cir. 2006).

The crux of Petitioner's initial NYCPL Article 440 motion submitted on November 21, 2002 concerned the alleged suppression of a deal reached between Respondent and Quinones in exchange for Quinones' testimony at the instant trial.  (First

Response, Ex. 5 [440 motion].)   Specifically, Quinones declared at trial that he had testified at three trials for the prosecutor, and he had received a deal only for his testimony in the first trial (involving the murder of Arthur Massey), where he had sold drugs and had supplied a weapon later used in the murder.   (Quinones Tr. 1328-30.) Quinones testified that he had received no deal for testifying against Petitioner in the instant trial.   (Quinones Tr. 1329.)   In his 440 motion, Petitioner contended that Quinones had lied in his testimony and Respondent withheld agreements made with Quinones, statements made by Quinones, and certain corrections records; Petitioner also asked the court to review the prosecution's files *in camera*.   (First Response, Ex. 5 at 13-14.)   On June 11, 2003, the 440 Court denied this branch of Petitioner's 440 motion, stating simply that "any other issue that [Petitioner] has failed to raise on appeal is deemed procedurally barred pursuant to CPL 440.10(2)(c)."

On April 28, 2006, Petitioner filed a motion in the Bronx Supreme Court to re-argue and renew his previously-decided NYCPL Article 440 motion.   In his state court motion, Petitioner expanded upon his earlier claims and argued that the fruits of co-defendant Chebere's FOIL proceedings suggested the existence of undisclosed cooperation agreements with Quinones, undisclosed statements of Quinones, and undisclosed correction records about the allegedly suspicious movement of Quinones. (Second Response, Ex. 1 at 9-13.)   Petitioner had previously contended that these same "missing" materials were Rosario material, but for the first time in this motion to reargue or renew, he identified them as Brady material.   (Id. at 7-8.)

On December 7, 2006, the Honorable Caesar Cirigliano denied Petitioner's motion to reargue, ruling that the motion was untimely and included "matters of fact not

offered on the prior motion."  The court also denied Petitioner's motion to renew, relying upon NYCPL § 440.10(2)(c), which requires denial of claims that could have been raised on direct appeal.  Accordingly, both the initial NYCPL Article 440 court and the second NYCPL Article 440 court denied Petitioner's Rosario/Brady claims on procedural grounds, namely, that these issues should have been raised on Petitioner's direct appeal.  As already determined, supra, this New York procedural bar constitutes an adequate and independent state ground preventing this Court's habeas review.

However, federal habeas review of procedurally defaulted claims is not barred if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice."  See Coleman, 501 U.S. at 750; Cruz v. Smith, 2009 U.S. Dist. LEXIS 25194 (S.D.N.Y. 2009).  Petitioner here does not argue that the failure to consider this claim will result in a fundamental miscarriage of justice; however, Petitioner does attempt to "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law."  (Petitioner's Reply to Respondent's Third Response, dated March 11, 2008, at 2-4.)

In arguing that he has sufficient "cause" for the default, Petitioner contends that he could not have raised his Brady/Rosario issue on direct appeal because he only learned of any "missing" evidence subsequent to the trial.  Specifically, Petitioner asserts that "while litigating a FOIL request to Respondent … it became evident that an un-defined number of documents were not properly considered for trial purposes."  (Second Amended Habeas, at 15.)  Petitioner points to Justice Ruiz's statement in her November 22, 2004 opinion concerning Hector Chebere's FOIL request that there existed "notes

taken during interviews of Quinones by ADAs and 48th Pct. Detectives … [which] all refer to the witness Quinones and reports generated through interrogation of," as well as "deals" made, with him."  (Second Response, Ex. 1 at 9-13.)  This statement, Petitioner argues, demonstrates that additional material concerning Quinones does exist, notably, multiples notes/reports and multiple deals, that was not provided to him prior to or during trial.

In response, Respondent asserts that Petitioner could have litigated his <u>Rosario</u> claim on his direct appeal because in his initial NYCPL 440 motion he raised the claim that Quinones had a cooperation agreement to testify in this case and that the prosecution withheld it.  In that NYCPL 440 motion, Petitioner relied upon 1) events memorialized in the instant trial record and the record of his prior trial for the attempted murder and robbery of Michael Smith (First Response, Ex. 5 at 3, 6, 9); 2) the Bronx District Attorney's Office's and the trial prosecutor's supposed history of engaging in prosecutorial misconduct (First Response, Ex. 3 at 12-13, Ex. 5 at 9), and; 3) the prosecutor's response papers to his and co-defendant Chebere's post-conviction requests seeking disclosure of documents, in which the prosecutor allegedly admitted that some documents were withheld.  (First Response, Ex. 3 at 13; Ex. 5 at 6-7.)  All of this evidence was available to Petitioner when he perfected his appeal.

From this, it is apparent that while Justice Ruiz's decision would have added weight to Petitioner's <u>Rosario</u> claim pertaining to Quinones, this additional evidence does not alter the fact that the <u>Rosario</u> claim could have been brought on direct appeal, but was not.  Accordingly, Petitioner has not demonstrated "cause" for his failure to follow New York State procedural rules and present his claim based on the trial record on direct

appeal.  See People v. Mower, 97 N.Y.2d 239 (2002) (under New York procedural law, claims based on the trial record must be brought on direct appeal).  Therefore, review of his habeas claim by this Court is barred.  Regardless, even if Petitioner has demonstrated "cause" for the default, for the reasons explained infra, he has not shown that he has suffered any prejudice, and accordingly, Petitioner's Brady/Rosario claim is barred.

      ii. *Petitioner's Brady/Rosario claim is meritless*.

In his initial habeas corpus petition, Petitioner framed Respondent's alleged failure to turn over documents and statements concerning Quinones as a violation of People v. Rosario, 9 N.Y.2d 286 (1961), which requires prosecutors to turn over copies of prior statements made by prosecution witnesses.  However, the failure to turn over Rosario material is not a basis for habeas relief, as the Rosario rule is purely one of state law.  Green v. Artuz, 990 F. Supp. 267, 274-75 (S.D.N.Y. 1998); Cruz v. Scully, 716 F. Supp. 766, 769 n.5 (S.D.N.Y. 1989); United States ex rel. Butler v. Schubin, 376 F. Supp. 1241, 1247 (S.D.N.Y. 1974), aff'd, 522 F.2d 527 (2d Cir. 1975).  Accordingly, the Rosario branch of Petitioner's petition is dismissed.

However, in Petitioner's motion to renew and re-argue his NYCPL 440 motion (Second Response, Ex. 1), which he incorporated into his latest amended petition for a writ of habeas corpus, Petitioner takes the same factual allegations that he had previously used to support his Rosario claim, and recasts his claim as a Brady violation, which is cognizable on federal habeas review.[5]  Under Brady v. Maryland, 373 U.S. 83, 87 (1963)

---

[5] Petitioner's Brady claim is unexhausted for federal habeas review because he never gave the state court a chance to determine it on the merits.  In that regard, although Petitioner raised the Brady claim in Bronx Supreme Court, he did so by means of a motion to renew or reargue a prior NYCPL Article 440 motion.  As Justice Cirigliano's decision indicates, this was the wrong procedural device for raising a new claim.  (Third Response, Ex. 3.)  Instead, Petitioner should have raised a Brady claim in a separate Article 440

and its progeny, the government must disclose evidence in its possession that is favorable to a defendant where the evidence is material either to guilt or to punishment.  Evidence is "favorable" if it tends to exculpate the defendant, see id. at 89, or if it impeaches the credibility of a government witness.  See United States v. Bagley, 473 U.S. 667, 676-77) (1985); Giglio v. United States, 405 U.S. 150, 154 (1972); United States v. Bin Laden, 397 F. Supp. 2d 465, 510 (S.D.N.Y. 2005) (cooperation agreement with witness is "quintessential" Brady material).

There are three essential components to a Brady violation: 1) that the evidence at issue was favorable to the accused, either because it is exculpatory or because it is impeaching; 2) that the evidence must have been suppressed by the Government, either willfully or inadvertently; and 3) that the defendant suffered prejudice as a result.  See United States v. Paulino, 445 F.3d 211, 224 (2d Cir. 2006).  In determining whether the suppressed evidence caused prejudice to Petitioner, the relevant query asks whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987)).

However here, before turning to whether the prosecutor committed a Brady violation, Petitioner's Brady claim fails because Petitioner has made no plausible

---

motion.  However, because Petitioner's Brady claim is factually dissimilar from his Rosario claim, which was exhausted in state court, it would make little sense for this Court to hold the petition in abeyance for Petitioner to exhaust his nearly identical Brady claim.  Accordingly, this Court will address Petitioner's Brady claim on the merits, without remanding it back to state court for exhaustion.  See McKethan v. Mantello, 292 F.3d 119, 122 (2d Cir. 2002) (when a district court is faced with a petition presenting both exhausted and unexhausted issue, it can either hold the petition in abeyance for the petitioner to return to state court and exhaust the claims, or it may also dismiss the petition with a judgment on the merits); Turner v. Artuz, 262 F.3d 118, 122 (2d Cir. 2001) (same); 28 U.S.C. § 2254(b).

showing that Respondent wrongfully suppressed any prior witness statements or cooperation agreements concerning Quinones.  In that regard, "when…an accused cannot possibly know, but may only suspect, that [Brady] information exists …, he is not required … to make a particular showing of the exact information sought and how it is material and favorable.   Instead, he need only at that stage "'make some plausible showing' that it does exist and how it would be 'both material and favorable to his defense.'"  Love v. Johnson, 57 F.3d 1305, 1313 (4th Cir. 1995) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 58 (1987)); Gonzalez v. Bennett, 2007 U.S. Dist. LEXIS 75783, at *4 (S.D.N.Y. 2007) (determining that a petitioner must show through "clear and convincing evidence" that undisclosed Brady material existed).  Only after the petitioner has made a plausible showing that the challenged materials do in fact exist, and that the government has in fact concealed them, can the court endeavor to determine whether a Brady violation occurred.

Here, Petitioner claims that the prosecution failed to turn over material pertaining to conversations which Quinones had with law enforcement, and "deals" (cooperation agreements) which the prosecution made with Quinones. (Petitioner's Amended Petition, Memorandum of Law, at 8-14.)  Petitioner also contends that the prosecution has failed to turn over materials or records from the Bronx House of Detention for Men (herein, "Bronx House") pertaining to Quinones and co-defendant Chebere.  (Id. 6-8.)  However, Petitioner has failed to make a plausible showing that any of the challenged materials do in fact exist.

Prior to trial, Respondent provided Petitioner with 409 pages of discovery material, including: Quinones' Grand Jury testimony; Quinones' plea and sentencing

minutes; Quinones' criminal history; Quinones' stenographic statements from September 25, 1993 and March 7, 1996; and Bronx House records for Quinones and co-defendant Chebere.  (Motion to Renew, Ex. B [list of Rosario materials turned over] at 8-11.)  On November 21, 2000, after he was convicted, Petitioner made a FOIL request asking for, as pertinent here, any and all statements, notes, transcripts, reports or records pertaining to Nick Quinones, as well as any and all cooperation agreements between the government and Quinones.  (Third Response, Ex. 1 [FOIL request].)  In response, in 2001 Respondent provided Petitioner with 205 pages of documents, which included a copy of Quinones' cooperation agreement to testify at the Arthur Massey murder trial which concerned the murder of Arthur Massey.   (Motion to Renew, Ex. G [Respondent's Disclosure].) Respondent also made available to Petitioner Quinones' testimony at that trial.  (Id.)

Further, Respondent's case file pertaining to this case was examined *in camera* by Justice Ruiz of the Bronx Supreme Court, who concluded that Respondent's disclosure had been sufficient, and that none of the alleged missing Brady material existed.  Lastly, Respondent has repeatedly and unequivocally stated that no other records of the type Petitioner describes exist or have ever existed.  (See First Response, Ex. 4 [Respondent's affirmation in opposition to Petitioner's 440 motion, dated March 6, 2003] at 8-10; First Response, Memorandum of Law, at 20-25; Respondent's Affirmation in Opposition to Petitioner's Motion to Reargue or Renew, dated September 25, 2006 at 5-11; Second Response, Memorandum of Law at 4-7; Third Response, Memorandum of Law at 6.) Thus, Respondent has turned over and examined a significant amount of materials, none of which indicate that the alleged "missing" Brady/Rosario materials related to Quinones actually exist.

In support of his argument that government has suppressed materials related to Quinones, Petitioner relies upon the following passage from Justice Ruiz's order: "[R]espondent acknowledges notes taken during interviews of Quinones by ADAs and 48th Pct. Detectives.  These items all refer to the witness Quinones and reports generated through interrogation of, or "deals" made, with him."  (Emphasis added).

Petitioner asserts that Justice Ruiz's reference to "interviews by Quinones by ADAs and 48th Pct. Detectives" proves that a disclosure violation exists because only one interview of Quinones by one assistant district attorney (Dawn Florio, the trial prosecutor) was in the prosecution's disclosure.  (Motion to Renew, Memorandum of Law, at 12.)  Yet in fact, two transcribed interviews of Quinones were disclosed to Petitioner before and during trial.  (Motion to Renew, Ex. B at 9 [list of interviews turned over].)  One interview was conducted on March 7, 1996 by ADA Florio, with Detective Moroney of the 48th Precinct attending.  (Id.)  Petitioner acknowledges that the People disclosed this interview to him before trial.  The second transcribed interview took place on September 25, 1993 and was conducted by Michele Rodney, another assistant district attorney.  (Id.)  Detective Moroney and another police officer were present during this earlier interview.  Indeed, Chebere's trial counsel cross-examined Quinones about the Rodney interview at trial.  (Quinones Tr. 1361-64.)  Further, since Chebere and Petitioner received the same discovery (Motion to Renew, Ex. B at 8 [discovery receipt signed by Petitioner's and his two co-defendant's counsel), it is inconceivable that Petitioner did not know about the Rodney interview prior to and during trial.  Thus, Petitioner's claim that only one ADA interview was disclosed to him is false, and Justice Ruiz's reference

to Quinones' interviews by multiple assistant district attorneys and detectives does not indicate any fact not disclosed to Petitioner at trial.

Next, Petitioner contends that Justice Ruiz's reference to "deals," plural, means that Quinones had multiple cooperation agreements with the government for each case in which he testified. However, Quinones got "deals" for testifying at the April 1996 trial about the September 12, 1993 murder at 2147 Honeywell Avenue in the Bronx. (Quinones Tr. at 1323-29.) He received immunity for his possession of the gun used in that murder and he got released from prison and sentenced to time served on April 22, 1996 on his January 1996 arrest (Bronx County Indictment 985/96) for the sale of three bags of heroin to an undercover officer.[6] (Id. at 1328; Motion to Renew, Ex. G at 1 [cooperation agreement].) These were the deals referred to by Justice Ruiz.

Petitioner's contention that there were "deals" for him to testify at multiple trials is further contradicted by the trial record in this case. Quinones' testimony at trial did not concern actual criminal activity that he witnessed or was involved in, rather, it concerned Chebere's admission to Quinones that he had been involved in Blanding's murder. Moreover, the prosecution elicited that Quinones had no charges pending against him at the time of trial. (Quinones Tr. at 1323.) Quinones' prior arrest for theft in Florida in 1991 had been satisfied by a plea of guilty in December 1995,[7] and the 1996 possession of the gun charge and 1996 sale of narcotics charge had been resolved pursuant to his 1996 guilty plea. (Id. at 1323-26.) Under these circumstances, the prosecution had

---

[6] Quinones testified that his plea agreement with the prosecutor did not provide that he had to give information or testimony in any other case. (Quinones Tr. at 1329.)

[7] Indeed, Quinones was cross-examined about his criminal record including his arrest in 1995 for criminal trespass that had not been elicited by the prosecution. (Quinones Tr. at 1358-59.) At no time during this cross-examination was it suggested that he had any criminal charges pending against him.

nothing to give Quinones in return for his testimony at the time of this trial in October 1998, so the likelihood of a plea agreement involving his testimony in this case is nil. Accordingly, there is no merit to Petitioner's claim that plea agreements with Quinones had been withheld by the prosecutor.[8]

Petitioner further alleges that suspicious cell transfers of Chebere and Quinones, while both were detainees at the Bronx House, were orchestrated by an NYPD Detective (Det. Miraglia), and that "it is not beyond reason to expect that [such movements] should have produced documents."   (Second Amended Petition, memorandum of law, at 8.) This is sheer speculation on the part of Petitioner; none of the FOIL requests of Petitioner or his co-defendant Chebere indicates that such a transfer occurred, and thus that no records therof exist.  See, e.g., United States v. Upon, 856 F. Supp. 727, 746 (E.D.N.Y. 1994) (stating that mere speculation is insufficient to establish a Brady violation); Mallet v. Miller, 432 F. Supp. 2d 366 (S.D.N.Y. 2006) (it is "well established that the mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief.")[9]

---

[8] In his 440 motion, Petitioner puts forth a host of other reasons that he purports demonstrate that the prosecution suppressed Quinones' cooperation agreement to testify in the instant case.  (First Response, Ex. 3 at 10-20.)  These include: 1) Respondent's responses to his and co-defendant Chebere's FOIL requests, in which Respondent allegedly admitted that it withheld documents; 2) the prosecutor's alleged threats to force Quinones to testify in the Arthur Massey case (which did not involve Petitioner), the Michael Smith attempted murder and robbery case in which Petitioner was convicted, and the instant case; 3) the prosecutor's alleged threats to Juan Ortiz, not a witness in this case, to testify falsely against Louis Bracero for the murder of German Morales (a completely unrelated matter); 4) the prosecutor's alleged dismissal from her job at Respondent's office for impeding a criminal investigation; 5) Respondent's alleged history of engaging in prosecutorial misconduct; 6) Quinones' allegedly unclear answer to a question at trial; 7) Quinones' trial testimony that he would lie to get out of jail, 8) the lack of questioning of police detectives about Quinones, 9) Quinones' placement into a jail cell next to Chebere, and 10) the lack of an adequate trial record concerning Rosario issues.  Each one of these "reasons" rests on speculation, and none provide a basis for a plausible showing that Respondent suppressed a cooperation agreement.

[9] In addition to requiring the suppression of evidence favorable to the accused, to prove a Brady violation, an accused must also show prejudice.  Here, and as explained in further details, infra, Petitioner raises a Brady claim only with regards to Quinones.  However, Quinones did not provide any evidence

In sum, Petitioner has not put forth a plausible showing that Respondent failed to turn over <u>Brady</u>/<u>Rosario</u> material.  <u>See, e.g.</u>, <u>United States v. Walker</u>, 1998 U.S. Dist. LEXIS 17203 (N.D.N.Y. 1998) (denying defendant's motion for a new trial based upon withholding of <u>Brady</u> evidence, because "defendant's claim of prosecutorial misconduct based on allegations that the government withheld material evidence … is speculative"); <u>Harris v. United States</u>, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998) (denying petitioner's 2255 habeas petition based upon withheld evidence because the "government does not bear the burden of establishing that documents were not withheld; it is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [petitioner]. Conclusory allegations that the government 'suppressed' or 'concealed' evidence do not entitle [petitioner] to relief.")  Accordingly, Petitioner's <u>Brady</u> claim is denied.

E. <u>Ineffective Assistance of Counsel</u>

In his second amended habeas petition, Petitioner contends for the first time that his trial counsel rendered ineffective assistance by: failing to obtain the allegedly withheld <u>Brady</u>/<u>Rosario</u> documents pertaining to Quinones (Second Amended Petition, at 32), failing to request an *in camera* inspection of the prosecutor's files related to Quinones (<u>id.</u> at 33-34), failing to question Nick Quinones, a prosecution witness at trial (<u>id.</u> at 31), and failing to attend a sidebar conference that occurred between the judge, the prosecutor, and Chebere's counsel during the cross-examination of Quinones (<u>id.</u> at 32). Petitioner's ineffective assistance claim is unexhausted because it was raised for the first time in his second amended habeas petition, and has not been presented to the New York

---

incriminating Petitioner.  Rather, Quinones' testimony implicated Chebere in the killing of Blanding. Accordingly, for this reason too, Petitioner's Brady claim fails.

State courts.  <u>See</u> 28 U.S.C. § 2254(b)(1)(A).  However, because Petitioner's ineffective assistance claim relates to Petitioner's <u>Brady</u>/<u>Rosario</u> claim, this Court will review the petition on the merits pursuant to Section 2254(b)(2).  <u>McKethan</u>, 292 F.3d at 122 (when a claim is unexhausted, the Court may deny it on its merits).  Here, Petitioner's ineffective assistance of counsel claim fails because it does not pass the two-prong test forth by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984).

i. *Quinones' Relevant Trial Transcript*

Petitioner and co-defendants Hector Chebere and Theodore Simpson were tried jointly for the June 10, 1993 murder of Damian Blanding.  At trial, Nick Quinones testified that after the murder, while he was detained at the Bronx House on drug charges, Chebere made incriminating statements to him about the murder of Damian Blanding. (Quinones Tr. 1330-35.)  Quinones did not claim that Chebere's admission had implicated Petitioner or co-defendant Simpson.  (<u>Id.</u>)  Quinones' sole testimony about Petitioner was that he knew Petitioner as "Chuley," Chebere's brother, who lived in the neighborhood.  (Quinones Tr. 1337-40.)  Quinones indicated that he knew where Petitioner lived, saw him once a week, and he knew that Petitioner and Chebere were friends with Simpson.  (<u>Id.</u>)  Quinones never implicated Petitioner or Simpson in any crime, nor did he say anything negative about them.

On cross-examination by Chebere's attorney, Quinones' criminal record was explored, as was his testimony in a previous trial.  (Quinones Tr. 1354-59.)  Quinones admitted that he had repeatedly lied to police and attorneys investigating the September 12, 1993 murder of Arthur Massey, that he had lied to authorities at other times as well, and that he had struck a deal with prosecutors such that if he testified at the trial

regarding the murder of Massey, he would receive immunity from prosecution for that homicide.  (Id. 1363-1374.)  Neither Petitioner's nor co-defendant Simpson's attorneys posed any questions.  (Id. 1384.)  On re-direct, Quinones testified that he had lied to authorities because his family had been threatened, and that his immunity agreement was conditioned on his truthful testimony.  (Id. 1386-1389.)

ii. *Legal Standard*

Strickland v. Washington, 466 U.S. at 694 sets forth a two-part test to determine if counsel's assistance is ineffective: "First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." 466 U.S. at 687; accord Henry v. Poole, 409 F.3d 48, 62-63 (2d Cir. 2005). This performance is to be judged by an objective standard of reasonableness and judicial scrutiny is to be "highly deferential."  Strickland, 466 U.S. at 688-89.  The Supreme Court noted that "[i]t is all too tempting . . . to second-guess counsel's assistance after conviction . . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id. at 689.  Moreover, Petitioner must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689.

Second, a petitioner "must show that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the

outcome." Id. at 694.  Performance of counsel must be considered in the aggregate, with a view of the totality of the evidence before the judge or jury.  Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001) (quoting Strickland, 466 U.S. at 695-96). The inquiry should focus on the fundamental fairness of the trial and whether, despite a strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process.  Id.

As there has been no state court adjudication on the merits of Petitioner's ineffective assistance claim and there is no procedural bar, then the *de novo* standard of review applies.  See Jimenez, 458 F.3d at 145 n. 17; Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003).

### iii. *Application*

Here, Petitioner's claim that his counsel was ineffective as pertains to his handling of prosecution witness Nick Quinones fails for the simple reason that Quinones' testimony had little, if anything, to do with Petitioner.  Quinones testified at trial that Chebere implicated himself in conversations he had with Chebere in a Bronx jail.  These conversations had nothing to do with Petitioner, and Quinones' sole reference to Petitioner was when he identified Petitioner as Chebere's half-brother.  Thus, as Quinones' testimony was irrelevant to the question of Petitioner's guilt, Petitioner cannot demonstrate that counsel's handling of Quinones, when considering the totality of the evidence adduced at trial, prejudiced him.

Petitioner nonetheless first contends that counsel was ineffective because he failed to question Quinones.  However, decisions about "whether to engage in cross-examination, and if so to what extent and in what matter, are … strategic in nature" and

generally will not support an ineffective assistance claim."  See Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002) (quoting United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987).  Here, the record evinces that counsel's reasoning for not cross-examining Quinones was sound.

In that regard, at a sidebar conference during Quinones' direct testimony, the prosecutor had indicated that she wanted to elicit that Quinones and Petitioner had had a prior relationship selling heroin together.  (Quinones Tr. 1340-51.)  Petitioner's attorney strenuously objected, and he successfully urged the trial court to preclude this testimony. Quinones' resultant testimony was so innocuous to Petitioner that Petitioner's attorney reached a reasonable, strategic determination not to question him at all.  (Id.)  Petitioner's counsel clearly had Petitioner's interest in mind when reaching that determination, as there was little reason for Petitioner's counsel to challenge Quinones' testimony.  (Id. 1344, 1346.)   Indeed, had Petitioner's attorney questioned Quinones, there was a possibility that he might lay the foundation for the jury to hear that Quinones and Petitioner had sold heroin together in the past.  (Id. 1340-1351.)  Since Quinones had said nothing to impugn Petitioner, much less inculpate him, and since Chebere's counsel had so effectively cross-examined him, and since further questioning could have had a deleterious effect on what the jury learned about Petitioner, it appears that counsel's tactical decision not to question Quinones was based on sound reasoning and good legal strategy.

Next, Petitioner claims that his counsel was ineffective for not finding the "missing" Brady/Rosario documents related to Quinones and for not requesting an *in camera* inspection to hunt for them.  However, as explained, supra, it is highly unlikely

that any such documents actually existed.  Counsel has an obligation not to bring spurious motions, and he cannot have rendered ineffective assistance for failing to find documents which do not exist.  See United States v. Arena, 180 F.3d 380, 396 (2d Cir. 1999) ("Failure to make a meritless argument does not amount to ineffective assistance"); Rosas v. United States, 2009 U.S. Dist. LEXIS 4374 (E.D.N.Y. 2009) (same).

Lastly, Petitioner faults his counsel for not attending a sidebar conference that occurred during the cross-examination of Quinones by Chebere's attorney, Mr. duBoulay.  (Second amended petition, memorandum of law, at 33.)  At the time of the sidebar conference, Mr. duBoulay had just finished asking Quinones about the terms of his deal, and had begun to question Quinones about conversations he had with law enforcement.  (Quinones Tr. 1379.)

duBoulay: And while you were discussing this matter with – this March 7th and March 8th, she asked you, did you know Hector Chebere?

Quinones: No.

duBoulay: Did she ask you whether you know any of these guys at that point?

People:    Objection.  May we appeoach?

Court:    Sure. (There's a discussion held off the record, at the bench, among the Court, [the People], and Mr. duBoulay.)

          (The following takes place in open court.)

Court:    Go ahead.

duBoulay:  And that was -- you remember having the conversation with that Assistant District Attorney in March, right?

(Quinones Tr. 1379-80.)  duBoulay then continued questioning Quinones about the terms of  his deal, how his desire to get out of jail may have motivated his cooperation, and

under what circumstance Quinones might lie.  (<u>Id.</u> 1380-84.)  Petitioner's counsel here cannot be considered ineffective for failing to attend the aforementioned sidebar.  First, there was a valid reason for Petitioner's counsel not being in attendance: counsel expended considerable efforts to distance his client from Quinones, whose testimony implicated only Chebere.  Indeed, the record evinces that counsel for Petitioner and counsel for Simpson both routinely chose not to approach the bench conferences requested by Mr. duBoulay.  (Quinones Tr. 1357, 1359, 1365, 1380, 1383.)  Further, even if Petitioner's counsel should have participated in the sidebar, Petitioner does not and cannot demonstrate any prejudice.  Indeed, the record shows that after the sidebar, duBoulay continued on with his questioning, and at no point after the sidebar was Petitioner implicated by Quinones.  Thus, the effect of the sidebar on Petitioner was immaterial.

Hence, Petitioner's ineffective assistance of counsel claim is dismissed.

## V. Conclusion

For the reasons stated above, the petition is denied.  As Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  <u>See</u> <u>Lozada v. United States</u>, 107 F.3d 1011, 1016-17 (2d Cir. 1997), <u>abrogated on other grounds</u>, <u>United States v. Perez</u>, 129 F.3d 255, 259-60 (2d Cir. 1997).  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith.  <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438 (1962).

IT IS SO ORDERED.

Dated: New York, New York

April 24 2009

Robert P. Patterson, Jr.

United States District Judge

Copies of this Opinion and Order Sent to:

Cesar Martinez
98A4892
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

Robert T. Johnson
Bronx County District Attorney
By: Robert R. Sandusky
198 East 161 Street
Bronx, New York 10451

58